FILED

2015 SEP 22  PM 2: 4

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2015 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 15 **CR15 - 0511** |
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. §§ 846, 841(b)(1)(C): Conspiracy to Distribute Oxycodone; 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Oxycodone; 21 U.S.C. §§ 963, 960(a)(1): Conspiracy to Import a Schedule III Controlled Substance; 21 U.S.C. §§ 952(b), 960(a)(1): Importation of a Schedule III Controlled Substance; 18 U.S.C. § 1956(h): Conspiracy to Engage in Money Laundering; 18 U.S.C. § 1957: Engaging in Transactions in Criminally Derived Proceeds; 18 U.S.C. § 2(b): Causing an Act to be Done; 31 U.S.C. § 5324(a)(3): Structuring; 21 U.S.C. § 853; 18 U.S.C. § 982(a)(1); and 31 U.S.C. § 5317(c): Criminal Forfeiture] |
| BERRY KABOV, DALIBOR KABOV, aka "Dabo," and GLOBAL COMPOUNDING, LLC, | |
| Defendants. | |

The Grand Jury charges:

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    Defendants BERRY KABOV ("B. KABOV") and DALIBOR KABOV, also known as "Dabo" ("D. KABOV"), owned and operated defendant GLOBAL

COMPOUNDING PHARMACY, LLC ("GLOBAL COMPOUNDING"). Defendant GLOBAL COMPOUNDING is a retail pharmacy located at 1544 Purdue Avenue, Los Angeles, California 90025.

2. On February 6, 2012, defendant GLOBAL COMPOUNDING became licensed with the California Board of Pharmacy. On March 2, 2012, defendant GLOBAL COMPOUNDING became registered with the United States Drug Enforcement Administration ("DEA") to dispense pharmaceutical controlled substances. Defendant GLOBAL COMPOUNDING is not registered with the DEA or otherwise lawfully authorized to import controlled substances into the United States.

3. Between June 2012 and December 31, 2014, defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING ordered and received from United States-based wholesale drug distributors approximately 98,800 pills of oxycodone, a Schedule II narcotic drug controlled substance commonly known by the brand name OxyContin; 30,600 pills of hydromorphone, a Schedule II narcotic drug controlled substance commonly known by the brand name Dilaudid; and 83,200 pills of hydrocodone, at the time a Schedule III narcotic drug controlled substance commonly known by the brand name Vicodin. Defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING also ordered and received various Schedule III anabolic steroid controlled substances from Chinese distributors and thus caused the drugs to be imported from China into the United States without lawful authority.

4. Defendants B. KABOV and D. KABOV controlled mailboxes located at commercial mail receiving agencies ("CMRAS") in Los Angeles, California, which defendants B. KABOV and D. KABOV would use to receive concealed bulk cash shipments from black-market oxycodone customers. These CMRA mailboxes included the following: (1) mailbox

2

number 409, held in defendant D. KABOV's name, and located at a CMRA on Westwood Boulevard in Los Angeles ("the Westwood CMRA"); and (2) mailbox number 511, held in the name of unindicted co-conspirator O.A., and located at a CMRA on Olympic Boulevard in Los Angeles ("the Olympic CMRA").

5. Defendants B. KABOV and D. KABOV, either individually or jointly, maintained control over the following financial accounts, among others, into which they deposited and through which they laundered the illicit proceeds of their sales of controlled substances: a Comerica Bank personal account ending in numbers 0765, held in the name of defendant D. KABOV ("the Comerica Account"); a Wells Fargo Bank ("WFB") account ending in numbers 5858, held in the name of defendant GLOBAL COMPOUNDING and controlled by defendants B. KABOV and D. KABOV ("WFB Account 1"); a WFB account ending in numbers 3192, held in the names of defendants D. KABOV and B. KABOV ("WFB Account 2"); a WFB account ending in numbers 2276, held in the names of defendants D. KABOV and B. KABOV ("WFB Account 3"); and a Chase Bank account ending in numbers 8781, held in the name of defendant D. KABOV (the "Chase Account"). Defendant D. KABOV also controlled an American Express credit card account ending in numbers 31005 (the "AmEx Account").

6. The Bank Secrecy Act ("BSA") is a set of laws and regulations enacted to address an increase in criminal money laundering through financial institutions. The BSA required domestic financial institutions to file a Currency Transaction Report ("CTR") for each deposit, withdrawal, exchange of currency, or other payment in currency of more than $10,000 by, through, or to such financial institutions.

3

COUNT ONE

[21 U.S.C. § 846]

A.    GENERAL ALLEGATIONS

The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 5 of the General Allegations of this Indictment as though fully set forth herein.

B.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to at least in or about June 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants B. KABOV and D. KABOV, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute oxycodone, a Schedule II narcotic drug controlled substance.

C.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.    Defendant B. KABOV would negotiate the sale of thousands of pills of oxycodone to black-market drug customers in areas including Columbus, Ohio (the "drug customers").

2.    Defendants B. KABOV and D. KABOV would ship thousands of pills of oxycodone from Los Angeles, California, to drug customers residing in and near Columbus, Ohio.

3.    In exchange for the concealed shipments of oxycodone, at bank branches located in and near Columbus, Ohio, the drug customers would deposit thousands of dollars in cash into the Chase Account, which defendants B. KABOV and D. KABOV would then withdraw from bank branches located in Los Angeles.

4

4.    Also in exchange for the concealed shipments of oxycodone, the drug customers would send bulk cash shipments of thousands of dollars at a time to defendants B. KABOV and D. KABOV, which the drug customers would ship from Ohio to mailboxes controlled by defendants B. KABOV and D. KABOV at the Westwood CMRA and the Olympic CMRA.

D.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants B. KABOV and D. KABOV, and others known and unknown to the grand jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California, and elsewhere:

1.    On December 6, 2011, an unidentified co-conspirator shipped a United States Postal Service ("USPS") parcel containing $5,000 cash from Columbus, Ohio, to the Olympic CMRA.

2.    On December 6, 2011, an unidentified co-conspirator shipped a USPS parcel containing $5,000 cash, and addressed to defendant D. KABOV, from Columbus, Ohio, to the Westwood CMRA.

3.    On December 7, 2011, an unidentified co-conspirator shipped a USPS parcel containing $4,000 cash from Columbus, Ohio, to the Olympic CMRA.

4.    On December 7, 2011, an unidentified co-conspirator shipped a USPS parcel containing $4,000 cash, and addressed to defendant D. KABOV, from Columbus, Ohio to the Westwood CMRA.

5.    On December 12, 2011, an unidentified co-conspirator shipped a Federal Express parcel containing $5,000 cash, and addressed to defendant D. KABOV, from Columbus, Ohio to the Westwood CMRA.

5

6. On December 12, 2011, defendant D. KABOV received from an unidentified co-conspirator a $1,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Dublin, Ohio.

7. On December 12, 2011, defendant D. KABOV received from an unidentified co-conspirator a $1,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Columbus, Ohio.

8. On December 13, 2011, defendant D. KABOV received from an unidentified co-conspirator a $1,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Gahanna, Ohio.

9. On December 13, 2011, defendant D. KABOV received from an unidentified co-conspirator a $1,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Hilliard, Ohio.

10. On December 14, 2011, in Los Angeles, California, defendant D. KABOV withdrew $3,000 in cash proceeds from the Chase Account.

11. On December 16, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Dublin, Ohio.

12. On December 16, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,500 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Gahanna, Ohio.

13. On December 16, 2011, in Los Angeles, California, defendant D. KABOV withdrew $4,000 in cash proceeds from the Chase Account.

6

14.    On December 19, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,100 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Columbus, Ohio.

15.    On December 19, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,300 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Columbus, Ohio.

16.    On December 19, 2011, in Los Angeles, California, defendant D. KABOV withdrew $4,000 in cash proceeds from the Chase Account.

17.    On December 20, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,000 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Dublin, Ohio.

18.    On December 20, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,000 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Hilliard, Ohio.

19.    On December 21, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,400 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Reynoldsburg, Ohio.

20.    On December 21, 2011, defendant D. KABOV received from an unidentified co-conspirator a $2,000 cash deposit into the Chase Account, which the unidentified co-conspirator made at a Chase bank branch in Columbus, Ohio.

7

21. On December 21, 2011, in Santa Monica, California, defendant D. KABOV withdrew $4,000 in cash proceeds from the Chase Account.

22. On December 21, 2011, in Los Angeles, California, defendant D. KABOV withdrew $2,000 in cash proceeds from the Chase Account.

23. On January 10, 2012, defendants B. KABOV and D. KABOV shipped and caused to be shipped a USPS parcel containing 300 pills of 30-milligram strength oxycodone and two pills of 20-milligram strength oxycodone from Los Angeles to Columbus, Ohio.

24. On January 14, 2012, defendants B. KABOV and D. KABOV shipped and caused to be shipped a USPS parcel containing 400 pills of 20-milligram strength oxycodone from Los Angeles to Dublin, Ohio.

25. On January 17, 2012, an unidentified co-conspirator shipped a USPS parcel containing $5,050 cash from Columbus, Ohio, to the Olympic CMRA.

26. On January 17, 2012, an unidentified co-conspirator shipped a USPS parcel containing $5,050 cash and addressed to defendant D. KABOV from Columbus, Ohio to the Westwood CMRA.

27. On January 31, 2012, defendants B. KABOV and D. KABOV shipped and caused to be shipped a USPS parcel containing 1000 pills of 20-milligram strength oxycodone from Los Angeles to Dublin, Ohio.

28. In May 2012, using coded language in a telephone conversation, defendant B. KABOV spoke to a person he believed was a black-market drug customer based in Columbus, Ohio, but who in fact was a confidential source working for law enforcement ("the CS"), during which defendant B. KABOV confirmed that he (defendant B. KABOV) received five parcels containing bulk cash, but that other

money parcels that the CS had sent had been seized by law enforcement.

29. In May 2012, using coded language in a telephone conversation, defendant B. KABOV instructed the CS to be careful when sending bulk money shipments in the future to avoid further law enforcement intervention, including to send them via Federal Express or UPS rather than via the United States Postal Service and to send them from various different cities.

30. In May 2012, using coded language in a telephone conversation, defendant B. KABOV agreed to send another shipment of oxycodone to the CS at an unspecified later date.

31. On May 30, 2012, defendants B. KABOV and D. KABOV, acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, shipped and caused to be shipped a Federal Express package (tracking number 8001 2082 9876) from Los Angeles, California, to the CS at an address in Winchester, Ohio, containing 1,000 pills of 20-milligram strength oxycodone ("the May 2012 oxycodone shipment").

32. On May 30, 2012, using coded language in a telephone conversation, defendant B. KABOV provided the CS with the tracking number (8001 2082 9876) for the May 2012 oxycodone shipment.

33. In June 2012, using coded language in a telephone conversation, defendant B. KABOV offered to supply the CS with 5,000 pills of 20- or 30-milligram strength oxycodone.

34. On June 5, 2012, using coded language in a telephone conversation, defendant B. KABOV told the CS to inquire with an unidentified co-conspirator regarding how many additional pills they could purchase from defendant B. KABOV.

9

35. On June 7, 2012, using coded language in a telephone conversation, the CS informed defendant B. KABOV that the CS had sent a package containing $3,000 cash to the Olympic CMRA ("the June 2012 money shipment").

36. In June 2012, using coded language in a telephone conversation, the CS provided defendant B. KABOV the tracking number (8001 3616 6631) for the June 2012 money shipment.

37. On June 8, 2012, defendants B. KABOV and D. KABOV received the June 2012 money shipment at the Olympic CMRA.

38. In June 2012, using coded language in a telephone conversation, defendant B. KABOV told the CS that defendant B. KABOV had access to drug customers in New York who would purchase black-market shipments of oxycodone at a rate of $50 per pill, and defendant B. KABOV instructed the CS to check with an unidentified co-conspirator in Columbus, Ohio, to ensure that they (the CS and the unidentified co-conspirator) would be able to continue to purchase bulk oxycodone from defendant B. KABOV.

39. In June 2012, using coded language in a telephone conversation, defendant B. KABOV told the CS that, to reduce the risk of law enforcement intervention, defendant B. KABOV preferred to sell oxycodone to customers with whom defendant B. KABOV has a pre-existing relationship.

40. In June 2012, using coded language in a telephone conversation, defendant B. KABOV agreed to send 3,000 pills of oxycodone to the CS.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about May 30, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV and DALIBOR KABOV, also known as "Dabo," while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, knowingly and intentionally distributed oxycodone, namely, approximately 1,000 pills of 20 milligram-strength oxycodone, a Schedule II narcotic drug controlled substance.

COUNT THREE

[21 U.S.C. §§ 963, 952(b), 960(a)(1)]

A.    GENERAL ALLEGATIONS

The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 5 of the General Allegations of this Indictment as though fully set forth herein.

B.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to at least on or about May 8, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally import Schedule III anabolic steroid controlled substances, in violation of Title 21, United States Code, Sections 952(b) and 960(a)(1).

C.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.    Defendants B. KABOV and D. KABOV would order bulk quantities of anabolic steroids from wholesale drug distributors located in the Hubei Province of China ("the Chinese distributors").

2.    Defendants B. KABOV and D. KABOV would instruct the Chinese distributors to ship anabolic steroids to defendant GLOBAL COMPOUNDING and would thereby cause the Chinese distributors to ship anabolic steroids from China to the United States.

3.    Defendant B. KABOV would wire money to the Chinese distributors as payment for the imported anabolic steroids.

12

D.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING, and others known and unknown to the grand jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California, and elsewhere:

1.    On April 13, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication to a wholesale drug distributor located in Hubei, China ("the Chinese distributor"), requesting to purchase bulk quantities of the following Schedule III anabolic steroid controlled substances: testosterone, oxandrolone, and nandrolone.

2.    On April 13, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication to the Chinese distributor agreeing to purchase 200 grams of testosterone, 100 grams of oxandrolone, and 100 grams of nandrolone ("the April 2012 drug order").

3.    On April 13, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication to the Chinese distributor confirming that they would wire $9,400 in United States currency, in an equivalent amount of Chinese Yuan, to the Chinese distributor as payment for the April 2012 drug order.

4.    On April 13, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication instructing the Chinese distributor to ship the April 2012 drug order to GLOBAL COMPOUNDING in Los Angeles, California.

5.    On April 13, 2012, in response to an e-mail communication from the Chinese distributor advising that the April 2012 drug order might not pass through customs inspection following the parcel's

13

entry into the United States, defendants B. KABOV and D. KABOV confirmed that the Chinese distributor should ship the parcel to Los Angeles, California.

6.  On April 15, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication to the Chinese distributor confirming that they had wired 18,500 in Chinese Yuan to the Chinese distributor via Western Union.

7.  On April 25, 2012, defendants B. KABOV and D. KABOV received an e-mail communication from the Chinese distributor showing that a parcel containing the April 2012 drug order was shipped from the Hubei Province of China on April 22, 2012; entered the United States at the San Francisco International Airport mail center on April 24, 2012; and was transported to Los Angeles, California the following day.

8.  On April 27, 2012, defendants B. KABOV and D. KABOV sent an e-mail communication to the Chinese distributor confirming that they received the April 2012 drug order.

9.  On April 5, 2013, defendant B. KABOV wired $650 from Los Angeles, California, to the Hubei Province of China.

10.  On April 20, 2013, defendants B. KABOV and D. KABOV imported from China into the United States approximately 385.6 grams of testosterone enanthate, a Schedule III anabolic steroid controlled substance, which entered the United States at the San Francisco International Airport in a parcel addressed to defendant GLOBAL COMPOUDNING that had been shipped from the Hubei Province of China.

11.  On April 15, 2014, defendant B. KABOV wired $370 from Los Angeles, California, to the Hubei Province of China.

14

12. On April 19, 2014, defendants B. KABOV and D. KABOV imported into the United States approximately 103 grams of nortestosterone decanoate, a Schedule III anabolic steroid controlled substance, which had entered the United States at the San Francisco International Airport in a parcel addressed to defendant GLOBAL COMPOUDNING that had been shipped from the Hubei Province of China.

13. On November 13, 2014, defendant B. KABOV wired $1,550 from Los Angeles, California, to the Hubei Province of China.

14. On December 24, 2014, defendant B. KABOV wired $1,600 from Los Angeles, California, to the Hubei Province of China.

15. On March 20, 2015, defendant B. KABOV wired $1,300 from Los Angeles, California, to the Hubei Province of China.

16. On May 8, 2015, defendant B. KABOV wired $240 from Los Angeles, California, to the Hubei Province of China.

COUNT FOUR

[21 U.S.C. §§ 952(b), 960(a)(1); 18 U.S.C. § 2(b)]

On or about April 25, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV, DALIBOR KABOV, also known as "Dabo," and GLOBAL COMPOUNDING LLC, knowingly and intentionally imported and caused to be imported into the United States approximately 200 grams of testosterone, a Schedule III anabolic steroid controlled substance.

COUNT FIVE

[21 U.S.C. §§ 952(b), 960(a)(1); 18 U.S.C. § 2(b)]

On or about April 25, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV, DALIBOR KABOV, also known as "Dabo," and GLOBAL COMPOUNDING LLC, knowingly and intentionally imported and caused to be imported into the United States approximately 100 grams of oxandrolone, a Schedule III anabolic steroid controlled substance.

COUNT SIX

[21 U.S.C. §§ 952(b), 960(a)(1); 18 U.S.C. § 2(b)]

On or about April 25, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV, DALIBOR KABOV, also known as "Dabo," and GLOBAL COMPOUNDING LLC, knowingly and intentionally imported and caused to be imported into the United States approximately 100 grams of nandrolone, a Schedule III anabolic steroid controlled substance.

COUNT SEVEN

[18 U.S.C. § 1956(h)]

A.    GENERAL ALLEGATIONS

The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 6 of the General Allegations as though fully set forth herein.

B.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, and continuing to at least on or about March 12, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses against the United States:

1.    Knowing that property involved in a financial transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, and conspiracy to import a controlled substances into the United States, in violation of Title 21, United States Code, Section 963, conduct and attempt to conduct financial transactions:

a.    knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of said unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

19

b.   knowing that the transactions were designed in whole and in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii); and

2.   Knowingly engage and attempt to engage in monetary transactions involving criminally derived property of a value greater than $10,000, which property represented the proceeds of specified unlawful activity, namely, conspiracy to distribute and to possess with intent to distribute a controlled substance and conspiracy to import a controlled substances into the United States, in violation of Title 18, United States Code, Section 1957(a).

C.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.   Defendants B. KABOV and D. KABOV would receive cash payments (the "criminal proceeds") from black-market drug customers totaling hundreds of thousands of dollars.

2.   Defendants B. KABOV and D. KABOV would deposit the criminal proceeds into defendant GLOBAL COMPOUNDING's primary business bank account, WFB Account 1, and into other bank accounts that they individually or jointly controlled, including the Comerica Account, WFB Account 2, and WFB Account 3.

3.   Defendants would deposit the criminal proceeds in structured amounts of $10,000 or less, often depositing the proceeds into multiple bank accounts using multiple ATM locations on the same day, in order to avoid triggering the banks' transaction reporting

20

requirements and to disguise the illegal nature and source of the criminal proceeds.

4.    Soon after such deposits would be made, defendants B. KABOV and D. KABOV would withdraw the criminal proceeds and would transfer the criminal proceeds from GLOBAL COMPOUNDING's primary business account, WFB Account 1, to the Amex Account, thereby further obscuring the illegal nature and source of the criminal proceeds.

D.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants B. KABOV, D. KABOV, and GLOBAL COMPOUNDING, and others known and unknown to the Grand Jury, committed, and willfully caused to be committed, various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

1.    On August 2, 2011, an unidentified co-conspirator made cash deposits of $4,000, $4,000, and $2,504.99, for a total of $10,504.99, into WFB Account 3.

2.    On August 2, 2011, defendant B. KABOV withdrew $10,785 from WFB Account 3.

3.    On October 19, 2011, an unidentified co-conspirator made cash deposits of $7,300 and $3,200 into WFB Account 1.

4.    On October 28, 2011, an unidentified co-conspirator made cash deposits of $5,000, $4,400, and $3,300 into WFB Account 1.

5.    On December 28, 2011, an unidentified co-conspirator made cash deposits of $4,100, $3,200, $2,700, and $2,000 into WFB Account 1.

6.    On December 29, 2011, an unidentified co-conspirator made cash deposits of $4,100, $3,200, $3,000, $2,800, $2,600, and $1,800

21

into WFB Account 1; a $4,000 deposit into WFB Account 3; and a $2,000 deposit into the Comerica Account.

7. On December 29, 2011, defendant D. KABOV transferred $26,735.64 from WFB Account 1 to the Amex Account.

8. On January 31, 2012, defendants B. KABOV and D. KABOV made cash deposits of $9,000, $4,700, $4,550, $3,750, $3,700, $3,250, $3,000, $3,000, $2,900, $2,400, $1,400, and $1,400, for a total of $43,050, into WFB Account 1.

9. On January 31, 2012, defendant D. KABOV transferred $40,492.57 from WFB Account 1 to the Amex Account.

10. On February 27, 2012, an unidentified co-conspirator made cash deposits of $4,450 and $1,550 into WFB Account 1.

11. On February 28, 2012, an unidentified co-conspirator made cash deposits of $5,000, $4,000, $4,000, $4,000, $3,000, $2,000, $2,000, and $1,200 into WFB Account 1; and a cash deposit of $140.38 into WFB Account 3.

12. On February 28, 2012, defendant D. KABOV transferred $31,259.41 from WFB Account 1 to the Amex Account.

13. On March 13, 2012, an unidentified co-conspirator made cash deposits of $5,000, $4,000, $4,000, $4,000, $4,000, $4,000, $4,000, for a total of $29,000, into WFB Account 1; and a cash deposit of $3,100 into the Comerica Account.

14. On March 13, 2012, defendant D. KABOV withdrew $29,000 from WFB Account 1.

15. On March 27, 2012, an unidentified co-conspirator made cash deposits of $6,000, $4,000, $4,000, $4,000, $3,550, $2,500, $2,000, $1,450, for a total of $21,500, into WFB Account 1; and a cash deposit of $2,200 into the Comerica Account.

16. On March 27, 2012, defendant D. KABOV transferred $24,500.41 from WFB Account 1 to the Amex Account.

17. On April 30, 2012, an unidentified co-conspirator made cash deposits of $5,000, $4,000, $3,800, $3,800, $2,300, $2,200, $2,200, $2,000, $1,700, and $700, for a total of $27,700, into WFB Account 1.

18. On April 30, 2012, defendant D. KABOV transferred $25,840.51 from WFB Account 1 to the Amex Account.

19. On May 30, 2012, an unidentified co-conspirator made cash deposits of $4,900, $4,800, $3,700, $3,700, and $3,300, for a total of $20,400, into WFB Account 1; and cash deposits of $3,600 and $750 into WFB Account 3.

20. On May 31, 2012, defendant D. KABOV transferred $21,000.00 from WFB Account 1 to the Amex Account.

21. On June 25, 2012, an unidentified co-conspirator made cash deposits of $4,700, $4,600, $4,000, $3,500, and $3,200 into WFB Account 1.

22. On September 27, 2012, an unidentified co-conspirator made cash deposits of $5,000, $5,000, and $4,900, for a total of $14,900, into WFB Account 1; and a $2,000 deposit into WFB Account 3.

23. On September 28, 2012, defendant D. KABOV transferred $13,979.13 from WFB Account 1 to the Amex Account.

24. On October 4, 2012, an unidentified co-conspirator made cash deposits of $4,100, $4,000, and $3,900 into WFB Account 1; and a cash deposit of $725 into WFB Account 3.

25. On November 30, 2012, an unidentified co-conspirator made cash deposits of $4,400, $4,400, $3,000, $1,500, $1,000, $1,000, $1,000, and $1,000 into WFB Account 1.

26. On December 31, 2012, an unidentified co-conspirator made cash deposits of $4,900, $4,500, $2,500, $1,100, and $1,000 into WFB Account 1; and cash deposits of $2,000, $1,960, $1,000, and $800 into WFB Account 3.

27. On April 1, 2013, an unidentified co-conspirator made cash deposits of $3,800 and $3,220 into WFB Account 1; and cash deposits of $3,000 and $2,800 into WFB Account 3.

28. On May 20, 2013, an unidentified co-conspirator made cash deposits of $4,550, $2,900, $4,600, and $3,500 into WFB Account 1; and a cash deposit of $2,000 in the Comerica Account.

29. On June 5, 2013, an unidentified co-conspirator made cash deposits of $1,300, $1,000, $1,000, and $786.23 into WFB Account 3; and a cash deposit of $10,000 into the Comerica Account.

30. On July 5, 2013, an unidentified co-conspirator made cash deposits of $1,000, $1,000, and $180 into WFB Account 3; and a cash deposit of $8,500 in the Comerica Account.

31. On July 12, 2013, an unidentified co-conspirator made cash deposits of $5,000, $5,000, $5,000, $2,500, $500, and $1,000 into WFB Account 1; and a cash deposit of $866.60 into WFB Account 3.

32. On November 24, 2013, an unidentified co-conspirator made cash deposits of $5,000, $5,000, $5,000, $4,900, $3,000, $3,000, $2,000, $1,100, and $800 into WFB Account 1.

33. On February 7, 2014, an unidentified co-conspirator made cash deposits of $5,000 in WFB Account 1; $2,000 into WFB Account 2; and $5,000 into WFB Account 3.

34. On February 18, 2014, an unidentified co-conspirator made cash deposits of $1,149.66 and $3,500 into WFB Account 1; and a cash deposit of $8,100 into the Comerica Account.

35.   On March 12, 2014, defendant B. KABOV made a cash deposit of $3,000 into WFB Account 3; and an unidentified co-conspirator made cash deposits of $1,000 and $300 into WFB Account 2; a cash deposit of $660 into WFB Account 1; and a cash deposit of $5,100 into the Comerica Account.

COUNTS EIGHT through SIXTEEN

[18 U.S.C. § 1957(a); 18 U.S.C. § 2(b)]

1.    The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraph 5 of the General Allegations of this Indictment as though fully set forth herein.

2.    On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV ("B. KABOV"), DALIBOR KABOV, also known as "Dabo" ("D. KABOV"), and GLOBAL COMPOUNDING LLC, knowing that the funds involved represented the proceeds of some form of unlawful activity, conducted, and willfully caused others to conduct, the following monetary transactions in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D):

| COUNT | DATE | DEFENDANT | MONETARY TRANSACTION |
|-------|------|-----------|----------------------|
| EIGHT | 8/2/2011 | B. KABOV | Withdrew $10,785.00 from WFB Account 3 |
| NINE | 12/29/2011 | D. KABOV | Transferred $26,735.64 from WFB Account 1 to the Amex Account |
| TEN | 1/31/2012 | D. KABOV | Transferred $40,492.57 from WFB Account 1 to the Amex Account |
| ELEVEN | 2/28/2012 | D. KABOV | Transferred $31,259.41 from WFB Account 1 to the Amex Account |
| TWELVE | 3/13/2012 | D. KABOV | Withdrew $29,000.00 from WFB Account 1 |

26

| THIRTEEN | 3/27/2012 | D. KABOV | Transferred $24,500.41 from WFB Account 1 to the Amex Account |
| FOURTEEN | 4/30/2012 | D. KABOV | Transferred $25,840.51 from WFB Account 1 to the Amex Account |
| FIFTEEN | 5/31/2012 | D. KABOV | Transferred $21,000.00 from WFB Account 1 to the Amex Account |
| SIXTEEN | 9/28/2012 | D. KABOV | Transferred $13,979.13 from WFB Account 1 to the Amex Account |

COUNTS SEVENTEEN through FORTY

[31 U.S.C. §§ 5324(a)(3), (d)(2); 18 U.S.C. § 2(b)]

1-2. The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 5 and 6 of the General Allegations of this Indictment as though fully set forth herein.

3. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants BERRY KABOV, DALIBOR KABOV, also known as "Dabo," and GLOBAL COMPOUNDING LLC, and others known and unknown to the Grand Jury, knowingly, and for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structured, assisted in structuring, and caused to be structured, the following transactions with domestic financial institutions, as part of a pattern of illegal activity involving more than $100,000 in a 12-month period, and while violating another law of the United States:

| COUNT | DATE | TRANSACTIONS |
|---|---|---|
| SEVENTEEN | 10/19/2011 | Cash deposits of $7,300 and $3,200 into WFB Account 1 |
| EIGHTEEN | 10/28/2011 | Cash deposits of $5,000, $4,400, and $3,300 into WFB Account 1 |
| NINETEEN | 12/28/2011 | Cash deposits of $4,100, $3,200, $2,700, and $2,000 into WFB Account 1 |
| TWENTY | 12/29/2011 | Cash deposits of $4,100, $3,200, $3,000, $2,800, $2,600, and $1,800 into WFB Account 1, cash deposit of $4,000 deposit into WFB Account 3; and cash deposit of $2,000 into Comerica Account |
| TWENTY-ONE | 1/31/2012 | Cash deposits of $9,000, $4,700, $4,550, $3,750, $3,700, $3,250, $3,000, $3,000, $2,900, $2,400, $1,400, and $1,400 into WFB Account 1 |

| COUNT | DATE | TRANSACTIONS |
|---|---|---|
| TWENTY-TWO | 2/28/2012 | Cash deposits of $5,000, $4,000, $4,000, $4,000, $3,000, $2,000, $2,000, and $1,200 into WFB Account 1; cash deposit of $140.38 into WFB Account 3 |
| TWENTY-THREE | 3/13/2012 | Cash deposits of $5,000, $4,000, $4,000, $4,000, $4,000, $4,000, and $4,000 into WFB Account 1; cash deposit of $3,100 into Comerica Account |
| TWENTY-FOUR | 3/27/2012 | Cash deposits of $6,000, $4,000, $4,000, $4,000, $3,550, $2,500, $2,000, $1,450 into WFB Account 1; cash deposit of $2,200 into Comerica Account |
| TWENTY-FIVE | 4/30/2012 | Cash deposits of $5,000, $4,000, $3,800, $3,800, $2,300, $2,200, $2,200, $2,000, $1,700, and $700 into WFB Account 1 |
| TWENTY-SIX | 5/30/2012 | Cash deposits of $4,900, $4,800, $3,700, $3,700, and $3,300 into WFB Account 1; cash deposits of $3,600 and $750 into WFB Account 3 |
| TWENTY-SEVEN | 6/25/2012 | Cash deposits of $4,700, $4,600, $4,000, $3,500, and $3,200 into WFB Account 1 |
| TWENTY-EIGHT | 9/27/2012 | Cash deposits of $5,000, $5,000 and $4,900 into WFB Account 1; cash deposit of $2,000 deposit into WFB Account 3 |
| TWENTY-NINE | 10/4/2012 | Cash deposits of $4,100, $4,000, and $3,900 into WFB Account 1; cash deposit of $725 into WFB Account 3 |
| THIRTY | 11/30/2012 | Cash deposits of $4,400, $4,400, $3,000, $1,500, $1,000, $1,000, $1,000, and $1,000 into WFB Account 1 |
| THIRTY-ONE | 12/31/2012 | Cash deposits of $4,900, $4,500, $2,500, $1,100, and $1,000 into WFB Account 1; cash deposits of $2,000, $1,960, $1,000, and $800 into WFB Account 3 |

| COUNT | DATE | TRANSACTIONS |
|---|---|---|
| THIRTY-TWO | 4/1/2013 | Cash deposits of $3,800 and $3,220 into WFB Account 1; cash deposits of $3,000 and $2,800 into WFB Account 3 |
| THIRTY-THREE | 5/20/2013 | Cash deposits of $4,550, $2,900, $4,600, and $3,500 into WFB Account 1; cash deposit of $2,000 into Comerica Account |
| THIRTY-FOUR | 6/5/2013 | Cash deposits of $1,300, $1,000, $1,000, and $786.23 into WFB Account 3; cash deposit of $10,000 into Comerica Account |
| THIRTY-FIVE | 7/5/2013 | Cash deposit of $1,000, $1,000, and $180 into WFB Account 3; cash deposit of $8,500 into Comerica Account |
| THIRTY-SIX | 7/12/2013 | Cash deposits of $5,000, $5,000, $5,000, $2,500, $500, and $1,000 into WFB Account 1; cash deposit of $866.60 into WFB Account 3 |
| THIRTY-SEVEN | 11/24/2013 | Cash deposits of $5,000, $5,000, $5,000, $4,900, $3,000, $3,000, $2,000, $1,100, and $800 into WFB Account 1 |
| THIRTY-EIGHT | 2/7/2014 | Cash deposits of $5,000 into WFB Account 1; cash deposit of $2,000 into WFB Account 2; and cash deposit of $5,000 into WFB Account 3 |
| THIRTY-NINE | 2/18/2014 | Cash deposits of $1,149.66 and $3,500 into WFB Account 1; cash deposit of $8,100 into Comerica Account |
| FORTY | 3/12/2014 | Cash deposits of $1,000 and $300 into WFB Account 2; cash deposit of $660 into WFB Account 1; cash deposit of $3,000 into WFB Account 3; cash deposit of $5,100 into Comerica Account |

FORFEITURE ALLEGATION ONE

[21 U.S.C. §§ 853 and 970]

1.    The allegations contained in Counts One through Six of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Sections 853 and 970.

2.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Sections 853 and 970, in the event of any defendant's conviction under any of Counts One through Six of this Indictment.

3.    Each defendant convicted under any of Counts One through Six of this Indictment shall forfeit to the United States any property constituting, or derived from, any proceeds such defendant obtained, directly or indirectly, as the result of such violation and any of such defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

4.    Pursuant to Title 21, United States Code, Section 853(p), each defendant so convicted shall forfeit substitute property, up to the value of the total amount described in paragraph 3, if, as the result of any act or omission of said defendant, the property described in paragraph 3, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished

31

in value; or (e) has been commingled with other property that cannot be subdivided without difficulty.

5.   If more than one defendant is convicted of any of the offenses set forth in Counts One through Six of the Indictment, each such defendant shall be jointly and severally liable for the entire amount ordered forfeited pursuant to that Count.

32

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

1.   The allegations contained in Counts Seven through Sixteen of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982.

2.   Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982, in the event of any defendant's conviction under any of Counts Seven through Sixteen of this Indictment.

3.   Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Sections 1956 or 1957, each defendant shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

4.   Pursuant to Title 21, United States Code, Section 853(p), each defendant so convicted shall forfeit substitute property, up to the value of the total amount described in paragraph 3, if, as the result of any act or omission of said defendant, the property described in paragraph 3, or any portion thereof (a) cannot be located upon the exercise of due diligence (b) has been transferred, sold to, or deposited with a third party (c) has been placed beyond the jurisdiction of the court (d) has been substantially diminished

in value; or (e) has been commingled with other property that cannot be divided without difficulty.

5.    If more than one defendant is convicted of any of the offenses set forth in any of Counts Seven through Sixteen of the Indictment, each such defendant shall be jointly and severally liable for the entire amount ordered forfeited pursuant to that Count.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317]

1.    The allegations contained in Counts Seventeen through Forty of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 31, United States Code, Section 5317.

2.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317, in the event of any such defendant's conviction under any of Counts Seventeen through Forty of this Indictment.

3.    Pursuant to Title 31, United States Code, Section 5317, upon conviction of an offense in violation of Title 31, United States Code, Section 5324, each defendant so convicted shall forfeit to the United States of America all property, real or personal, involved in the offenses and any property traceable to such property.

4.    Each defendant so convicted shall forfeit substitute property, up to the value of the total amount described in paragraph 3, if, as the result of any act or omission of said defendant, the property described in paragraph 3, or any portion thereof (a) cannot be located upon the exercise of due diligence (b) has been transferred, sold to, or deposited with a third party (c) has been placed beyond the jurisdiction of the court (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

35

5.    If more than one defendant is convicted of any of the offenses set forth in Counts Seventeen through Forty of the Indictment, each such defendant shall be jointly and severally liable for the entire amount ordered forfeited pursuant to that Count.

A TRUE BILL

/S/
Foreperson

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

KEVIN M. LALLY
Assistant United States Attorney
Chief, Organized Crime Drug
    Enforcement Task Force Section

BENJAMIN R. BARRON
Assistant United States Attorney
Deputy Chief, Organized Crime
    Drug Enforcement Task Force
    Section

RYAN H. WEINSTEIN
Assistant United States Attorney
Organized Crime Drug Enforcement
    Task Force Section