NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BENJAMIN R. BARRON (Cal. Bar No. 247094)
Assistant United States Attorney
Deputy Chief, OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3542
     Facsimile: (213) 894-0142
     E-mail:    ben.barron@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-511(A)-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT DALIBOR KABOV'S SENTENCING OBJECTIONS |
| v. | |
| BERRY KABOV, et al., | Hearing Date: Feb. 27, 2019 |
| Defendants. | Hearing Time: 3:30 p.m. |
| | Location:    Courtroom of Hon. Dolly Gee |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Benjamin R. Barron, hereby files its Response to Defendant Dalibor Kabov's Sentencing Objections.

///

This Response is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 25, 2019                    Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


            /s/
BENJAMIN R. BARRON
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

The government submits this pleading to respond to the claims raised in defendant Dalibor Kabov's objections to the presentence report, filed in this matter on February 22, 2019 (Dkt. No. 368, the "Objection"). The government is cognizant that the issues in this case been extensively briefed, and that the Court is well familiar with the facts and has now repeatedly found the evidence against the defendants to be overwhelming. But the government does not want to take a chance that the Court may be persuaded by any of the (entirely baseless) claims in the Objection, and thus will briefly respond.

The government will organize its response in the same manner that they are presented in the Objection, namely, by the respective paragraph of the PSR for defendant Dalibor Kabov (Dkt. No. 199). To keep this submission as short as possible, and because the government's sentencing paper (Dkt. No. 255) already provides a detailed account of the facts and supporting evidence, the government will provide a summary response only to each claim, and the government will skip over claims that particularly obviously fail.

The government also will not respond to claims in the Objection that duplicate arguments addressed in the briefing on defendants' most recent new-trial motions, in support of which the Objection provides no new evidence, including:

- D. Kabov duplicates defense claims that their massive cash fortune was the product of a gift from their mother, which the Court has already found is contradicted by "overwhelming evidence of Defendants' guilt," (Dkt. No. 364), and which the government already addressed at length in its sentencing brief (Dkt. No. 255 at 15-18).

- D. Kabov reiterates the defense claim that a voice expert's report proves that B. Kabov was not the speaker in recorded calls with the Ohio CS, but the government has already addressed the overwhelming evidence that B. Kabov was the speaker, which is in fact corroborated by the defense report.  (Dkt. No. 357 at 27-33.)

- D. Kabov reiterates the defense claim that the Kabovs' failure to report data to CURES for multiple stretches, each exceeding over a year, was the product of a technical "glitch," but the government has repeatedly refuted this blatantly false assertion. (See, e.g., Dkt. No. 357 at 34-36.)

- The government has already extensively addressed the evidence contradicting D. Kabov's denial of control over the private mailboxes used to receive concealed cash shipments from Ohio drug customers and related defense arguments regarding the shipments (Id. at 11-18), and the Court has likewise rejected them — repeatedly (Dkt. Nos. 322 at 1-2; 357 at 3-4).

The government also notes that D. Kabov's submission of blatantly false claims in a sentencing brief that he personally authored further supports a two-level enhancement for obstruction or impeding justice under U.S.S.G. § 3C1.1, Cmt. Nt. 4(F), 4(H) ("examples of the type of conduct to which this adjustment applies" includes "providing materially false information to a judge" and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court").

Paragraph 20: The government agrees that Global Compounding Pharmacy ("GCP") was not receiving oxycodone from wholesalers until June 2012.  Prior to that, the Kabovs were acquiring oxycodone using fraudulent prescriptions in the names of identity theft victims or

2

their family and friends, which would be "filled" (fraudulently acquired) at another pharmacy located less than a mile from GCP, Westside Pharmacy.  The supporting evidence includes proffered statements by the corrupt doctor used by the Kabovs, Joseph Altamirano; text messages seized from B. Kabov's phone regarding his ability to acquire black market drugs from the owner of Westside Pharmacy; CURES records showing that the same identity theft victims had opioid prescription filled in their names at that other pharmacy before the prescriptions in the same victims' names were filled at GCP upon its opening; drug ledgers seized from the Kabovs' residence and pharmacy regarding black market oxycodone transactions conducted both before and after GCP opened, via prescriptions issued in identity theft victims' names, including on dates that correspond with when opioid prescriptions were in fact filled at Westside Pharmacy in the victims' names; and the Google contact list bearing the identity theft victims' names seized from the Kabovs' residence. Notably, the contact list is dated in March 2010, which precisely corresponds with the earliest dates when prescriptions in the stolen identities were filled at Westside Pharmacy (prior to GCP opening) as reflected the patient CURES records admitted in TX 15.

Paragraph 21: D. Kabov's claim that he did not arrange late-night meetings with Dr. Altamirano at any bars on late nights, and that Dr. Altamirano would bring his prescription pad with him during the meetings, is contradicted by text messages from the Kabovs' own phones blatantly making such arrangements with him (TX 571) and by Dr. Altamirano's proffers (Ex. B to Dkt. No. 255).  D. Kabov's claim that neither he nor GCP entered false information into the CURES database is contradicted not only by overwhelming evidence of their

3

submissions to CURES of entries in identity theft victims' names for prescriptions they never actually filled, but also by testimony of four such victims that they never filled prescriptions at GCP, never saw Dr. Altamirano, and never lived at addresses marked as theirs in the fraudulent CURES data submitted by GCP.  (In fact, one of the victims did not live in California and another did not live in Southern California at the time fraudulent entries were submitted in their names falsely identifying them as local residents.)

Paragraph 22: Defendant suggests that the pharmacy had legitimate customers who "patronized GCP on a daily bas[i]s" during the investigation — yet, tellingly, the defense failed to proffer a single such narcotic customer to testify on their behalf at trial. Ironically, the only customer they called to testify for the defense, a doctor who purchased anabolic steroids from the Kabovs for AIDS and HIV patients, expressed surprise on learning that the Kabovs were importing the drugs from China and stated that, had he known, he "would not have ordered medication from them" for his vulnerable patient population.  (Dkt. No. 308, RT 1/13/2017, at 17-19.)

Paragraph 23: This paragraph pertains to the Google contact list seized from the Kabovs' residence (TX 510), which, as noted, bears the names of the identity theft victims named on the fraudulent Altamirano opioid prescriptions throughout the conspiracy. (Altamirano's fraudulent prescriptions accounted for 99% of the opioid prescriptions "filled" at GCP throughout the conspiracy, and as noted the patients named on the prescriptions were either the identity theft victims listed on the Google contact list or the Kabovs' family members and close friends (TX 4-6).)  Defendant asserts that the names on the Google contact list had been filling

4

prescriptions at multiple pharmacies prior to GCP's opening.  In fact, they were "filling" prescriptions at one location, Westside Pharmacy, and as the government addressed this above this is an incriminating fact regarding the Kabovs' source of black market supply prior to opening GCP.[1]

Paragraph 26: D. Kabov claims that the government misled the jury and the Court by presenting "fabricated" ARCOS records at trial. But ARCOS records are merely data that the government collects from wholesalers regarding pharmacy transactions for Schedule II drugs and Schedule III narcotics, and here the data was backed up by subpoenaed wholesale records, which were made available in discovery and much of which were presented at trial.  (See, e.g., TX 210 (McKesson records).)  Moreover, the government submitted records seized from GCP itself, including the totality of the pharmacy's invoices from wholesalers for opioid orders.  (TX 520, 521, 522.)  D. Kabov also blames the pharmacist employed at GCP, Michael Lowe, for the offenses at issue.  Of course, Mr. Lowe received meager compensation for his work at GCP and did not even have a key to the pharmacy, and the Kabovs' black market trafficking predated the opening of GCP.  Among other evidence overwhelmingly contradicting D. Kabov's blatantly false assertion, the Kabovs enjoyed millions of dollars in illicit proceeds and a lavish lifestyle, were the ones whose fingerprints were on black market oxycodone parcels and who were recorded negotiating transactions with the Ohio CS, were the ones who received

---

[1] Later in the Objection, D. Kabov asserts that the government failed to "provide the source of the google list."  (Objection at Par. 52.)  In fact, trial testimony demonstrated that the list was generated from the account of Kabov associate Obai Ahmadi, based on notations of "mom" and "dad" with the phone numbers of Ahmadi's parents.  (Dkt. No. 308, RT 1/13/2017 at 52-53.)

tens of thousands of dollars in cash compensation, were the ones meeting with Altamirano late at night to obtain fraudulent prescriptions in identity theft victims' names as corroborated by their own cellphones, were the ones in possession of an array of incriminating ledgers and related evidence in their residence, and were the ones who threw a lavish party in Las Vegas where they supplied bowls of manufactured opioids and bragged about the quality of their supply.[2]

In the same paragraph, D. Kabov also asserts that 30-mg oxycodone is not the maximum strength available for that drug.  This is a misleading argument.  It is the maximum strength for the immediate release variant of oxycodone, which is the type most sought after on the black market for the obvious reason that it provides an instant and powerful high, as opposed to slow-acting variants that use special coating to prevent addicts from smashing and snorting the drugs.  The government's first witness, an expert on drug strength, scheduling, and black market trafficking, explained this at trial. (See Dkt. No. 206, RT 1/4/2017, at 24-30.)

Paragraph 27: Defendant suggests that the government misled the Court about the Kabovs' use of narcotic powder to unlawfully manufacture opioids.  (The manufacture was unlawful not only because the pills were for black market sale and were concealed by fraudulent prescriptions, but also because the Kabovs' compounding licensure did

---

[2] At paragraph 82, D. Kabov also appears to blame Lowe for the insurance fraud scheme that began in January 2015.  This claim is contradicted by the witness statements of Erica Carey, by the Kabovs' payment of kickbacks to Carey, by text messages between the Kabovs and Carey, and, here again, by the overwhelming evidence of the Kabovs' control over the scheme and enjoyment of its criminal fruits. (Dkt. No. 255 at 10-11 (addressing evidence of fraud scheme).)

not allow them to churn out batches of thousands of pills of maximum-strength pills.)  Defendant suggests that the government failed to inform the Court how much powder was left in manufacturer bottles seized from GCP, but the parties entered a factual stipulation at trial addressing that very point.  (TX 230.)  For example, there was 32.07 grams of oxycodone powder seized from a 500-gram container of oxycodone.  The 467.93 grams of depleted oxycodone was alone enough to manufacture more than 15,500 pills of 30-mg oxycodone, and the evidence seized from GCP and included at trial documented the batches of thousands of pills of 30-mg oxycodone (among other opioids) that D. Kabov was manufacturing at GCP (see, e.g., TX 257, 513-516).

Paragraphs 28-30: D. Kabov attempts to justify the "medical necessity" of the steroids that the Kabovs ordered from China, claiming that the steroids were tested by a third party laboratory prior to sale by GCP.  Of course, all of the Kabovs' orders from China were illegal because they lacked any authorization to import controlled drugs, and the Kabovs also created advertisements that lied about the source of their drug stock.  In any event , an audit of GCP in 2016 by pharmacy board inspector Anna Kalantar found that GCP — including D. Kabov personally — had fabricated records regarding safe handling of drug stock, and that GCP used filthy equipment, adulterated drug stock, and expired drug stock.  (Dkt. No. 306, RT 1/11/2017 at 84-103.)  The Kabovs showed utter disregard for public safety even as to their non-opioid drug sales.

7